**ABC OFFICE EQUIPMENT, INC., Plaintiff,**

v.

**ROYAL CONSUMER BUSINESS PRODUCTS, A DIVISION OF TRIUMPH–ADLER–ROYAL, INC., Triumph–Adler North America, Inc., Defendants Third–Party Plaintiffs,**

v.

**John J. CRIMMINS, Third–Party Defendant Cross–Complainant,**

v.

**ROYAL CONSUMER BUSINESS PRODUCTS, A DIVISION OF TRIUMPH–ADLER–ROYAL, INC., Triumph–Adler North America, Inc., Cross–Defendants.**

**Civ. No. H–87–613 (PCD).**

United States District Court,
D. Connecticut.

Oct. 5, 1989.

Joseph C. Morelli, Steier & Associates, West Hartford, Conn., for plaintiff.

Raymond T. DeMeo, Timothy S. Fisher and Kathleen C. Stone, Robinson & Cole, Hartford, Conn., for defendants third-party plaintiffs.

Helen Apostolidi, McWeeny & Ferguson, Hartford, Conn., and Leon M. Rosenblatt, West Hartford, Conn., for third-party defendant cross-complainant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

DORSEY, District Judge.

On October 6, 1987, John J. Crimmins filed a cross-complaint against Royal Consumer Business Products ("Royal"), a division of Triumph–Adler–Royal, Inc. ("TARI") and Triumph–Adler North America, Inc. ("TANA"). Royal moves for permission to file a motion for summary judgment directed to Crimmin's cross-complaint. The motion is granted.

*Facts*

Crimmins became President of Royal in 1984 pursuant to an employment contract with T/A Business Systems, Inc., then Royal's corporate parent. In December 1986, Crimmins was asked by Giovanni Fei, President of TANA, to transfer to New Jersey, where Royal planned to relocate its corporate headquarters. Crimmins declined. By letter dated December 23, 1986, Fei indicated that failure to accept the transfer was considered a resignation and that his employment agreement was voided. The letter also proposed that "if [Crimmins] remained with the company until May 31, 1987 and assisted with the transition period of relocating the company ... [he] would be entitled to a severance allowance equal to the continuation of all company benefits and salary for a period of 6 months." Crimmins agreed and accepted the terms of the letter by signing and returning it to Fei on December 31, 1986. Royal found a new president, Marion Baker, earlier than expected, who assumed her duties on March 1, 1987. Crimmins was released from active participation on that date, but remained available and was occasionally consulted through May 31, 1987. Affidavit of Crimmins, ¶ 8. Crimmins received his salary and benefits until May 31, 1987. By letter dated May 12, 1987, E.A. Vogus, Director of Human Resources, inquired as to Crimmins' preference as to payment of the severance allowance, lump sum or salary continuation. Vogus also noted that the severance allowance was contingent on a covenant not to compete during the period covered by the severance allowance pursuant to his July 14, 1976 employment agreement.

Crimmins alleges in the first and third counts of his cross-complaint that Royal has wrongfully refused to pay him the "severance allowance" and accrued vacation pay, respectively. In addition, in his second and fourth counts, Crimmins brings a statutory wage claim under Conn.Gen. Stat. § 31–72 seeking double damages, costs and attorney fees for such non-payment.

*Discussion*

█ Royal asserts that it is entitled to summary judgment on the first and third counts on the grounds that it has paid Crimmins' compensatory damage claim in full, including accrued interest at the statutory rate. Crimmins contends that the money tendered was merely an offer of settlement which has not been accepted and has no legal effect. Royal has proposed an accord and satisfaction which, if accepted, would warrant granting its motion. Absent acceptance, summary judgment is not warranted on Counts One and Three.

█ Double damages under § 31–72 is a punitive award requiring a finding of bad faith, arbitrariness, or unreasonableness. *Kepchar v. Diehl Research Center*, Civil No. B–84–428 (D.Conn. Aug. 31, 1988), Memorandum of Decision at 19, citing *Crowther v. Gerber Garment Technology, Inc.*, 8 Conn.App. 254, 265–66, 513 A.2d 144 (1986). Thus, double damages will not be awarded for a mere breach of contract. *Id.* Such a determination presents an issue of fact properly resolved by the trier of fact.

However, whether Crimmins' severance allowance and accrued vacation pay constitute "wages" under § 31–72 can be resolved. Wages are defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or

other basis of calculation." Conn.Gen.Stat. § 31–71a(3).

*Severance Allowance*

■ Neither this court's research nor the parties' have revealed any Connecticut case law construing severance pay as "wages" under § 31–71a. The "severance allowance" offered to Crimmins was consideration for his agreement to remain with the company until May 31, 1987 and to assist the company's relocation. Royal contends that severance pay is not "compensation for labor or services rendered by an employee," Conn.Gen.Stat. § 31–71a(3), but rather is a benefit conferred upon an employee after the termination of employment in recognition of past services and to ease any economic readjustment attributable to dismissal. *See Mace v. Conde Nast Publications, Inc.*, 155 Conn. 680, 685, 237 A.2d 360 (1967). Plaintiff does not present a classic example of severance pay in that the agreement which provided it was entered into after Royal had stated that it considered Crimmins' employment contract terminated. If Crimmins had not agreed to the terms of the December 23 letter, Royal's stated position was that his employment was terminated and no severance pay would have been agreed upon. It is neither necessary nor appropriate to speculate what other course the parties might have followed had the December 23 letter not been agreed to. The six month "severance allowance" was offered in the face of Royal's stated position that Crimmins' employment was at an end. The offer thus had the purpose of inducing Crimmins to remain with Royal, while his replacement was sought and to aid in relocation. It was in essence a new agreement under which Crimmins agreed to remain with Royal until May 31, 1987 for which he was to receive a salary and thereafter severance was to be paid equal to six months' salary.

In construing the definition of wages, two Connecticut Superior Courts have looked to cases construing the definition of "total wages" under the unemployment compensation statute, Conn.Gen.Stat. § 31–222(b)(1), for guidance. *See Palladino v. Northeast Graphics, Inc.*, No. 347358

(Conn.Super.Court, Hartford/New Britain at Hartford, Mar. 8, 1989), Memorandum of Decision at 3; *Balet v. Town of East Hartford*, 13 C.L.T. 23 (Conn.Super.Court, Hartford/New Britain at Hartford, Apr. 29, 1987). In *McGowan v. Administrator*, 153 Conn. 691, 220 A.2d 284 (1966), the court noted that the term wages, defined under § 31–222(b) as "all renumeration for employment," "connotes all renumeration for any service performed in the course of an employer-employee relationship." *Id.* at 693, 220 A.2d 284. Thus, the court held that "[s]ince, in connotation of the statute, wages cease when employment does, severance pay cannot be considered wages." *Id.*

The "severance allowance" in issue is not found to be within the § 31–71a(3)'s definition of wages. The allowance was an additional payment provided to induce Crimmins to remain with Royal for the interim relocation period and not "compensation for labor or services rendered." The statute, which provides an extraordinary statutory remedy, is concerned with timely payment of wages and was enacted to discourage the unilateral withholding of wages by an employer. The "severance allowance" in issue was a bonus above and beyond the regular salary drawn by Crimmins until his termination on May 31, 1987. The six month figure appears to be an arbitrary figure provided as a bonus with no relation to any service rendered by Crimmins.

Crimmins argues that Vogus' May 12, 1987 letter imposed on him a covenant not to compete with Royal and that this is sufficient to bring the "severance allowance" within the statutory meaning of "wages." *See Kepchar*, Memorandum of Decision at 19. In his May 12 letter, Vogus asserted that Crimmins' severance allowance was contingent on a covenant not to compete contained in his July 14, 1976 employment agreement. However, as previously noted, Royal considered his prior employment agreement voided by his failure to agree to relocation and the parties entered into a subsequent employment agreement on December 31, 1987 which did not provide for any further covenant or ongoing commitment not to compete. In fact, Crimmins, in his May 26, 1987 letter in

response to Vogus, expressed his preference of receiving the severance allowance in one lump sum and asserted that he was only bound by the December 31 agreement and felt no obligation not to compete after his May 31 termination date.[1] *See* Exhibit H to Crimmins' 11/9/87 Affidavit. Accordingly, the "severance allowance" is not found to be in consideration of a covenant not to compete, but was a bonus for the agreement to assist in relocation and is not within the definition of wages under § 31–71a(3).

### Accrued Vacation Pay

■ Crimmins asserts that his accrued but unpaid vacation pay at the time of his termination constitutes wages as defined in § 31–71a(3). In *Palladino*, Memorandum of Decision at 3, the Superior Court held that "accrued vacation pay did not constitute 'wages' as that term is contemplated" by Conn.Gen.Stat. § 31–72. The court reasoned that the statute draws a distinction between "accrued fringe benefits" which includes vacation pay, *see* Conn.Gen.Stat. § 31–76k, and "wages" and that § 31–72 provides for double damages for failure to make wage payments, but makes no mention of the failure to pay fringe benefits upon termination as required by § 31–76k. *Id.* at 2–3. If the legislature has intended to include fringe benefits or accrued vacation pay in the definition of "wages" in § 31–71a(3), it could have expressly done so in light of the distinction drawn in the statutory scheme. In addition, the Connecticut Supreme Court in *McGowan*, 153 Conn. 691, 220 A.2d 284, in defining "wages" in the context of unemployment compensation, held that the term wages connotes all renumeration for service performed in the course of the employment relationship and that vacation pay did not constitute wages, but was payment "by way of compensation for loss of wages." *Id.* at 693, 220 A.2d 284. Accrued vacation pay provided upon termination is not akin

to wages for services rendered, but is a fringe benefit not within the definition of wages. Conn.Gen.Stat. § 31–71a(3). Accordingly, since the renumeration in issue is not found to be wages for the purposes of a statutory wage claim under § 31–72, Royal's motion for summary judgment on Counts Two and Four is granted.

### Summary

Royal's motion for summary judgment is granted as to Counts Two and Four and denied as to Counts One and Three.

SO ORDERED.

Ronald **BENEDICT**, Petitioner,

v.

Robert J. **HENDERSON**, Superintendent, Auburn Correctional Facility, Respondent.

No. 87–CV–1019.

United States District Court, N.D. New York.

Oct. 10, 1989.

---

1. Whether plaintiff had an ongoing obligation to abide by the non-competition clause is not, and need not be, here decided. As non-competition was a term in the arrangement reached on December 31, 1987, it could only have been found in the prior agreement. If it was still enforceable after December 31, 1987, it would only have derived from the earlier agreement (as Vogus asserted in his letter of May 12). Thus, it would not be consideration for the severance pay agreed on as part of the December 31, 1987 understanding.

Hinman, Howard & Kattel, Binghamton, N.Y., Albert J. Millus, Jr., of counsel, for petitioner.

Robert Abrams, Atty. Gen. of the State of N.Y., Albany, Robert A. Siegfried, Asst. Atty. Gen., for respondent.

## MEMORANDUM–DECISION and ORDER

JAMES T. FOLEY, Senior District Judge.

The petition in this habeas corpus proceeding was lawyer prepared and is an exemplary one in form and content. The one petition challenges two separate judgments of conviction entered in Broome County Court based upon separate indictments and jury trials. The first judgment of conviction of petitioner was entered March 6, 1984 for Attempted Murder Second Degree and Robbery First Degree. The second judgment of conviction was entered July 12, 1984 for Burglary Third Degree. On the separate counts of attempted murder and robbery, the petitioner was sentenced to 12½ to 25 years to run concurrently. On the burglary conviction several months later after a separate jury trial, the petitioner was sentenced to 3½ to 7 years consecutive to the attempted murder and robbery sentences. Attorney Millus was the assigned counsel for petitioner in the New York Appellate Courts and also filed petitions for Certiorari in each case in the United States Supreme Court that were denied. The citation of these appellate decisions are set forth in the petition, and copies are attached to the petition as exhibits.

Ground 1 of the petition concisely sets forth the facts in support of the claim, that at the trial of petitioner for attempted murder and robbery, the petitioner then represented by the Broome County Public Defender's Office, was denied the right of effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution. Ground 2 of the petition relates to the Burglary conviction and sets forth briefly the facts to support the claim that he was convicted at that trial by the selective use of the prosecutorial immunity power in violation of the Fifth Amendment to the United States Constitution.

In a substantial Report–Recommendation of sixteen pages dated June 22, 1989, Magistrate Gustave J. DiBianco made detailed

findings and analysis of the pertinent case law. He recommended that the petition challenging the separate convictions be denied and dismissed. In footnote 1 of page 2 of the Report–Recommendation, the Magistrate notes the vast accumulation of state court records filed with the Answer of Respondent, together with a memorandum of law that was replied to by the attorney for petitioner. The final submissions at this review level were extensive objections to the Report–Recommendation filed by petitioner on July 19, 1989, and a reply thereto by Assistant Attorney General Siegfried filed August 11, 1989. I have read through the relevant portions of the state court records and briefs to be considered in this federal application for habeas corpus relief.

In the petition and brief in support, the factual circumstances claimed to have been ineffective representation of trial counsel in the murder-robbery trial are pinpointed. The Magistrate reviews them on pages 5 and 6 with specific references to the trial transcript. Outside of the presence of the jury, the transcript at that stage of the trial indicates defense counsel stating to the court that the petitioner/defendant wished to testify despite his advice not to do so. Counsel stated that he had advised petitioner/defendant that his previous felony conviction could be brought out and he would be subject to thorough cross-examination. Counsel also told the Court in presence of the petitioner/defendant that he had made him aware of his general position and opinions regarding the case and that likelihood of success in his favor was minimal. The petitioner/defendant insisted and was called to the witness stand by his counsel and was duly sworn. His counsel only asked him several preliminary questions, including one for disclosure of his previous felony conviction, then asked him to tell his knowledge regarding the incident that took place in a Binghamton restaurant on a certain date. Trial Transcript (Tr.T) pgs 97–100. Then petitioner/defendant gave rambling testimony in narrative fashion to the effect that he did not participate in the stabbing and robbery that took place in the restaurant but was at the scene as a lookout for the actual robber

whom he never named. At its conclusion, defense counsel only asked if there was anything he wished to add and when petitioner/defendant said he did not believe so, his counsel asked in conclusion if he were left or right handed (Tr.T 101–104). This question related to the testimony of a Doctor that the wounds of the victim had an entry point on his left side (Tr.T 77, 121–122).

This particular conduct of trial counsel is pointed out as serious error in allowing the petitioner to give his testimony about his involvement only as a lookout in his own narrative way without the guidance of direct questioning by his counsel. It is upon this alleged failure of appropriate questioning that the main reliance is placed to support the claim of ineffective assistance of counsel that rises to the stature of a federal constitutional deprivation. The noted case of the United States Supreme Court, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) prescribes the standards and principles to be applied to challenges of this kind. Petitioner has the burden to show that counsel's performance fell below an objective standard of reasonableness and that there was incompetence and resulting prejudice. *Strickland v. Washington*, supra, pgs. 687–688, 104 S.Ct. pgs. 2064–2065; *Kimmelman v. Morrison*, 477 U.S. 365, 381–382, 106 S.Ct. 2574, 2586–2587, 91 L.Ed.2d 305 (1986). Petitioner must also show that there existed a reasonable probability of a different result in the proceeding but for the errors of counsel that might have fallen below an objective standard of reasonableness. *Mills v. Scully*, 826 F.2d 1192, 1197 (2d Cir.1987); *Maddox v. Lord*, 818 F.2d 1058, 1061 (2d Cir.1987).

 Applying the established principles and standards of the above authorities, from my review, it is my judgment that the petitioner not only fails to sustain his burden of showing that his trial counsel representation was not reasonably effective but also that the limited error alleged in his performance might have been serious enough to affect and change the jury guilty verdict. In *Strickland*, 466 U.S. at 697,

104 S.Ct. at 2069–2070, it is ruled that if it is easier to dispose of an ineffectiveness claim on the ground of lack of prejudice, that course should be followed. The evidence against the petitioner is detailed by the Appellate Division in 124 A.D.2d 890, 508 N.Y.S.2d 656. Magistrate DiBianco in his Report–Recommendation, p. 10 summarizes the prosecution evidence:

"The prosecution had a *Miranda* rights waiver signed by petitioner, a two-page written statement by petitioner acknowledging his guilt and specifying the details of the crimes, a pre-trial photo and line-up identification as well as in court identification of petitioner by the victim who was stabbed during the robbery, recovery of the weapon at the precise location where petitioner told police it was, testimony from a witness who related that petitioner had told her he was planning a crime and that he needed a weapon, and another witness who testified that petitioner told her that he was leaving New York State because the police were looking for him because he had stabbed a man while robbing a restaurant. TT at 82–84, 29, 31, 17, 19, 36, 43–46."

The objections filed to the Report–Recommendation, p. 5, concede that there was much evidence against the petitioner. I find no fault with the characterization of the Magistrate that such evidence was overwhelming and that petitioner's testimony given at the trial even if it had been guided by direct questioning would not have altered the outcome of the trial. The second prong of the *Strickland* test is definitely not satisfied.

■ In view of that conclusion, it may be unnecessary to grade trial counsel's performance. *Strickland v. Washington,* 466 U.S. at 697, 104 S.Ct. at 2069–2070; *Nix v. Whiteside,* 475 U.S. 157, 188, 106 S.Ct. 988, 1005, 89 L.Ed.2d 123 (1986, Blackmun J. concurring). However, if necessary, I would grade it, without question, reasonably effective and without serious deficiency. The Appellate Division, Third Department found the representation meaningful, that counsel was adequately prepared, vig-

orously advanced defendant's cause and employed the basic principles and techniques of criminal procedure. 124 A.D.2d at 891, 508 N.Y.S.2d 656. Magistrate DiBianco elaborated further upon the efforts of trial counsel with the conclusion that counsel diligently represented petitioner throughout the pre-trial proceedings as well as the trial. Report–Recommendation, pp. 8–9.

In regard to the omission of direct questioning, it is my judgment that the most skillful examiner in that respect could not have made persuasive or convincing the position and testimony of petitioner that he only participated as a lookout at the scene of the robbery. Trial counsel had to walk a fine line in presentation of such testimony when weighed against the considerable prosecution evidence to the contrary. Although not so expressed, it is evident that trial counsel had justifiable doubts about the truth of that position. I think he acted sensibly and preserved the continuance of the trial and the confidence of petitioner by his careful statements for the record. By allowing the narrative form of testimony without intrusion of direct questions, the obligation was met not to assist in any way presenting false evidence or otherwise violating the law. *Nix v. Whiteside,* 475 U.S. 157, 166, 106 S.Ct. 988, 994, 89 L.Ed.2d 123 (1987). Counsel's conduct was consistent and in compliance with the recommendation in New York Code of Professional Responsibility, Ethical Considerations 7–5, 7–6, 7–26; Disciplinary Rule 7–102. The recommendation is that if counsel suspects his client is going to lie, he can do no more than assist his client to deliver his statement in narrative form as opposed to eliciting the perjurious testimony by questioning, thereby promoting perjury. Report–Recommendation, p. 7. I find nothing in *Nix v. Whiteside* that such approved conduct measures up to a Sixth Amendment violation as is contended for petitioner. In fact *Nix v. Whiteside,* 475 U.S. at 165, 106 S.Ct. at 993 reiterates the *Strickland* mandate that prevailing norms of practice as reflected in American Bar Association Standards and the like are only guides. It is further cautioned that "when examining

attorney conduct, a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts". *Id.*

In the objections for petitioner, it is complained that the Magistrate in his Report–Recommendation failed to consider or even mention the primary case relied upon by petitioner, *Ferguson v. Georgia,* 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961). As the Respondent reply states, the rulings in that case are inapplicable factually and legally to this situation. The vague and general challenges concerning coerced confession and identification problems were not raised to the Magistrate by the petition or in the State Appellate Courts and are not properly before this court. On reliable identification it is interesting to read the testimony of the victim at the Suppression hearing held before Judge Robert W. Coutant on December 21, 1983.

The petition for federal habeas corpus relief in regard to the Attempted Murder and Robbery convictions is denied and dismissed.

## II.

### The Burglary Conviction

As previously stated, the challenge to this conviction, rendered at a separate trial from the murder-robbery one, is that it was obtained by the selective use of the immunity power in violation of petitioner's due process rights under the Fifth Amendment to the United States Constitution. The material facts relevant to the claim are contained in the transcript of the Burglary trial at pages 213 to 220. It appears that the petitioner's defense counsel attempted to call as a witness, a co-defendant, who had pleaded guilty to the same crime with which petitioner was charged and then being tried. An offer of proof stated by counsel was that this witness would testify that petitioner was not involved in the burglary. An attorney was appointed to advise the witness of his Fifth Amendment rights since his own case was on appeal. The prosecution refused to request the court to grant the witness immunity. The court then advised the witness it was not empowered to grant immunity. After further discussion, the witness stated it was his intention to claim his privilege against self-incrimination. The court would not permit the witness to testify on direct examination knowing that the witness intended to take his privilege on cross-examination, reasoning that the prosecution would be deprived of effective cross-examination. Tr.T (Burglary) 218–219. The defendant then testified and denied any involvement in the crime. A summary of these facts are contained in the petition herein for habeas corpus (pp. 5–6) and in the Appellate Division, Third Department, Memorandum decision affirming the judgment of conviction. *People v. Benedict,* 115 A.D.2d 795, 495 N.Y.S.2d 735 (1985).

At the outset, there is presented the substantial question that review of this federal habeas corpus petition is barred by an adequate and independent finding of procedural default in the New York Courts unless petitioner can show "cause and prejudice". *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Engle v. Isaac,* 456 U.S. 107, 110, 102 S.Ct. 1558, 1562–1563, 71 L.Ed.2d 783 (1982). The appeal in this burglary conviction to the New York Court of Appeals was by permission of an Associate Judge of the Appellate Division, Third Department. The Summary in the decision of the Court of Appeals states that "defendant argued that his due process right to a fair trial was violated when the People declined to request immunity for the prospective witness". The opinion of the Court affirmed the Order of the Appellate Division stating "The only issue raised by appellant cannot be reviewed by this Court because not preserved (C.P.L. 470.05[2] ). *People v. Benedict,* 68 N.Y.2d 832, 833, 508 N.Y.S.2d 175, 500 N.E.2d 873 (1986). A motion for reargument on this point was denied without opinion. 68 N.Y.2d 998, 510 N.Y.S.2d 1029, 503 N.E.2d 126 (1986).

C.P.L. 470.05[2], N.Y.Crim.P.Law, has been described by the United States Supreme Court as embodying New York's cautious contemporaneous-objection policy and notes its judicially created exceptions. *Ulster County Court v. Allen*, 442 U.S. 140, at pp. 150–151, nn. 8–9, 99 S.Ct. 2213, at pp. 2221, nn. 8–9, 60 L.Ed.2d 777 (1979); *see also Wainwright v. Sykes*, supra, 433 U.S. 72, at 88–89, 97 S.Ct. 2497, at 2507–2508, 53 L.Ed.2d 594 (1977). In this instance, the verbatim statement of trial counsel in regard to the refusal of the People to request immunity for the prospective witness is contained in the transcript of the burglary trial. Tr. pp 219–220. This statement and the complete provisions of C.P.L. 470.05 are set forth in Respondent's Memorandum of Law attached as Ex. A, pp. 13, 14. Reply to Petitioner's Objections to the Report–Recommendation.

The New York Court of Appeals by specific reference to C.P.L. 470.05[2] ruled by its brief opinion that the issue of violation of right to a fair trial by declination to request immunity for a prospective witness was not properly preserved. The denial of a motion for reargument reaffirmed that position. This interpretation of non-compliance with New York's criminal law by its highest Court is entitled to respectful acceptance in this federal habeas corpus proceeding.

The United States Supreme Court has made a recent ruling to overcome confusion that existed in the application of the procedural default rule. The common solution is that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case *"clearly and expressly"* states that its judgment rests on a state procedural bar. *Harris v. Reed*, —— U.S. ——, —— ——, 109 S.Ct. 1038, 1042–1045, 103 L.Ed.2d 308 (1989, emphasis supplied). The reference to the New York contemporaneous-objection rule is surely clear and express as to where the New York Court of Appeals rested its judgment. A very recent opinion by the Court of Appeals, Second Circuit, affirming the denial of federal

habeas corpus, answers the contentions of petitioner herein that procedural default does not lie inasmuch as the decision of the New York Court of Appeals was sua sponte and that the procedural bar issue was not raised in the Appellate Division, Third Department, which decided without objection of the prosecution the immunity issue on the merits. The Second Circuit stated that the ruling of the New York Court of Appeals being sua sponte on a similar issue is of no consequence, and the failure of the prosecution to argue a procedural bar does not disable a state court from recognizing one where it exists. *Jacquin v. Stenzil*, 886 F.2d 506 (2d Cir.1989). In the instance here, the Court of Appeals, the highest and last Appellate Court in New York rendered a clear judgment in the case based expressly upon a procedural bar.

■ I agree with the reasoning and supportive case law set forth by the Magistrate in his Report–Recommendation at pp. 11–13 that petitioner has not shown "cause" for the procedural default and actual "prejudice" from the alleged constitutional violation. The issue of immunity for a witness had been reviewed several times in the New York Court of Appeals, and it cannot be said that the claim was so novel that its legal basis was not reasonably available to trial counsel. *See People v. Adams*, 53 N.Y.2d 241, 247–48, 440 N.Y. S.2d 902, 423 N.E.2d 379 (1981); *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). The substantial evidence against petitioner, detailed in the Report–Recommendation at p. 13, the fact that petitioner took the stand and testified that he did not participate in the crime as the prospective co-defendant witness similarly would have testified, does not indicate in my judgment that the alleged error of refusal of witness immunity deprived petitioner of a fair trial. *See Holland v. Scully*, 797 F.2d 57, 69 (2d Cir.1986).

In his Report–Recommendation, pp. 14–16, Magistrate DiBianco after assuming petitioner was able to overcome the procedural default, still recommends denial of the habeas corpus application challenging the

burglary conviction. This position reaches the merits of the issue. Although I am firm in my conviction that procedural default has been established and bars this consideration, in view of the prolonged history of review, I accept this alternative recommendation. I find the reasoning of the Magistrate on the merits sound and his analysis and application of the pertinent case law correct. If necessary, I would also deny the application on the merits.

The Appellate Division, Third Department, discussed the issue of the declination to grant immunity to a prospective defense witness and found no merit in the assertion. *People v. Benedict,* 115 A.D.2d 795, 796, 495 N.Y.S.2d 735 (1985). The opinion observed that only a single witness for the People was immunized, and there was no impermissible building of the People's case or indication of bad faith or misconduct on the part of the prosecution. It points out that under New York Crim.Proc.Law 50.30 the prosecution alone has the power to obtain immunity for witnesses and under the factual pattern cannot be faulted under New York law for being unwilling to confer immunity. An important factor was that there existed the possibility that the witness might avoid prosecution for a past crime. These reasons are persuasive and strongly supported by the trial record.

Federal case law on the immunity claim is similar. In *United States v. Turkish,* 623 F.2d 769, at 778 (2d Cir.1980), cert. denied 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981), the thought was expressed that a trial judge should summarily reject claims for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target for prosecution. *Grochulski v. Henderson,* 637 F.2d 50, 52 (2d Cir.1980) noted that immunity in New York is full transactional immunity and therefore is a serious and justifiable consideration in the exercise of the prosecution power under N.Y.Crim.P.Law 50.30. The testimony implicating the petitioner in the burglary crime included the testimony of two accomplices in its participation and five other witnesses who testified petitioner admitted he had committed the crime. In the con-

text of the entire record, it is difficult for me to accept the argument that the omitted testimony of the prospective accomplice witness, in itself only corroborative of petitioner's actual testimony, would have created reasonable doubt. *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.1983).

The Report–Recommendation of the Magistrate is accepted and adopted. The objections of petitioner to it are overruled for the reasons stated herein. The petition is denied and dismissed in its entirety.

It is so Ordered.

**WHIMSICALITY, INC., Plaintiff,**

v.

**RUBIE'S COSTUMES CO., INC., Defendant.**

**No. CV 89–1720.**

United States District Court, E.D. New York.

Sept. 11, 1989.

Virginia R. Richard and Pamela Bradford, Kane, Dalsimer, Sullivan, Kurucz, Eisele and Richard, New York City, for plaintiff.

Andrew S. Langsam, Levisohn, Lerner & Berger, New York City, for defendant.

DEARIE, District Judge.

This matter is before the Court on plaintiff's application for a preliminary injunction. Plaintiff alleges that defendant's production and distribution of certain children's Halloween costumes infringe plaintiff's copyrighted "soft sculpture" designs. Plaintiff also alleges unfair competition in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and state law.

At the close of oral argument, there appearing to be no dispute as to the material facts bearing on the copyright claim, the Court indicated that it would consolidate the instant application with the merits of the case. *See* Fed.R.Civ.P. 65(a)(2). The parties thereafter submitted extensive additional legal memoranda, affidavits and documentary evidence. Defendant also cross-moved to dismiss the complaint.

As described in greater detail below, the Court has resolved the question in this case in favor of the defendant, and on August 18, 1989, issued an order denying plaintiff's application for injunctive relief and granting defendant's motion to dismiss the copyright infringement claim. The Court also directed the parties to proceed with discovery on the unfair competition claims and to appear for a status conference on October 6, 1989 at 9:30 A.M. This opinion sets forth the basis of the Court's decision. *See* Fed.R.Civ.P. 52(a).

FACTS

A. *The Parties*

Plaintiff Whimsicality, Inc. ("Whimsicality"), a Vermont corporation, is a young and to date thriving enterprise. Founded in 1978 by Pierre Couture, its current president, Whimsicality designs, manufactures and sells various home craft items, such as children's apparel, quilts, adult toys and novelties. Whimsicality promotes its products as home-styled and "made in Vermont." Defendant Rubie's Costume Co., Inc. ("Rubie's"), a New York corporation, for over thirty five (35) years has manufactured, designed and marketed a wide range of theatre-related items, including numerous costumes for children and adults, as well as Halloween novelty items, masks, theatre props, and make-up kits. Rubie's gross sales totalled over $30 million in 1988.

B. *The Allegedly Infringed Items*

Since 1985, Whimsicality has distributed a line of items designed by Mr. Couture, which it has described to this Court and to the United States Copyright Office as "soft sculptures." Since 1985, when it introduced the Jack O'Lantern (its first soft sculpture design and one of the six items allegedly infringed by defendant), Whimsicality has enjoyed great success with its soft sculptures. At present, the line consists of 66 different soft sculpture designs. The other five allegedly infringed by defendant are Hippo Ballerina, Spider, Tyrannosaurus Rex ("T–Rex"), Bee and Penguin.

Whimsicality's soft sculpture designs have received substantial publicity[1] and

---

1. Over the last two years Whimsicality's designs have been featured in the Chicago Tribune, the Detroit News, the Providence Journal Bulletin,

on the cover of New York Magazine, in the trade publications Playthings and Toy and Hob-

### I.

---

by, and on a nationally telecast edition of ABC Business World News.